Georgia Harris, Calvin Binion, and Gregory Binion appeal from the trial court's judgment forfeiting $165,501 in U.S. currency (against Georgia Harris and Gregory Binion) and one 1991 Lexus automobile, VIN# JT8UF11E5M0094283 (against Calvin Binion). As to the currency, Georgia Harris and Gregory Binion argue, and as to the automobile, Calvin Binion argues, that the State failed to prove that the search of their residence was conducted pursuant to a lawful search warrant; that the State destroyed evidence potentially helpful to Georgia Harris and Gregory Binion, by depositing the seized currency into a bank account where it was commingled with other currency; that the forfeitures of the currency and the vehicle violate the Eighth Amendment's prohibition against excessive fines; and that the State failed to prove that the currency or the vehicle was used or intended to be used in violation of the Alabama Uniform Controlled Substances Act.
The State filed its complaint against Georgia Harris, Gregory Binion, and Calvin Binion seeking forfeiture of the currency and the automobile, pursuant to § 20-2-93, Ala. Code 1975. Following oral proceedings, the trial court entered the following judgment:
 "Background. This cause is a civil forfeiture action brought by the State of Alabama on behalf of the West Alabama Narcotics Squad (hereinafter WANS) pursuant to § 20-2-93, Code of Alabama, 1975 (as amended 1990), wherein the State seeks condemnation of currency in the amount of $165,501.00 and a 1991 Lexus, VIN JT8UF11E5M0094283. The action was filed by the State on December 17, 1999, following the seizure by WANS of the currency and vehicle during the execution of a document search warrant on December 1, 1999, at a residence at 3116 38th Avenue in Tuscaloosa, Alabama, in Tuscaloosa County. The residence is owned by Claimant Georgia Binion Harris, who, at the time of execution of the search warrant, *Page 179 
 lived in the house with her husband, Reginald Harris and her son, Gregory Roshard Binion (hereinafter Gregory Binion). In Claimants' Answer, Georgia Harris claimed ownership of $120,000.00 and Gregory Binion claimed ownership of $35,501.00.[1] Claimant Calvin Binion, the paternal grandfather to Gregory R. Binion, has claimed ownership of the Lexus and is in fact the registered titleholder to the vehicle.
 "Factual Findings. In the State's case-in-chief, numerous witnesses testified, including Claimant Calvin Binion, Christopher Witherspoon, who is an associate of Gregory Binion, numerous agents of WANS, a D.E.A. [Drug Enforcement Agency] Agent, the Chief Clerk of the Tuscaloosa County Probate Court, two cash transaction investigators of the Alabama Bureau of Investigation, Robert Skelton, the locksmith who installed a safe at the Harris/Binion home, and several patrol officers of the Tuscaloosa Police Department.
 "Claimants Georgia Harris and Calvin Binion testified on their behalf. Claimant Gregory Binion invoked his rights under the Fifth Amendment to the U.S. Constitution and did not appear at the trial. Reginald Harris also testified on behalf of Claimants.
 "Christopher Witherspoon testified that he had received cocaine `on consignment' from Gregory Binion on several occasions between February and October 1999. He had also observed, while at Gregory Binion's residence at 3116 38th Avenue, several individuals visiting Gregory Binion, namely Aundra Hill, a/k/a `Fat Man,' Tyrone Billups, Willie Brown, a/k/a `Little J,' Alexious Holliday, a/k/a, `A-Dell,' and Jonathan Elliott, a/k/a `J-Rock.' During their visits, he observed them taking illegal drugs out of the residence in Wal-Mart shopping bags, and bringing large amounts of cash into the residence in clear plastic bags. This money would be taken into the spare bedroom of the residence, which is the bedroom in which $120,000.00 of the currency was seized from a floor safe, according to the testimony of Robert Skelton and Agent Clint Davis of WANS. The last occasion on which Witherspoon saw currency enter the residence was in October 1999, just two months before the seizure in this case, when it was brought in by Tyrone Billups in a gallon-sized Ziploc [plastic] bag.
 "Witherspoon also testified, based on his experience, that it is common for individuals involved in the sale of drugs to stack and bundle currency in a particular manner. He testified that the money is generally stacked into $1,000.00 bundles, which are in turn stacked into $10,000.00 bundles held together by rubber bands. This is the manner in which all of the currency seized in this case had been stacked. Further, Agents Wayne Robertson and Clint Davis of WANS testified based on their experience to this common practice of drug dealers, as did Special Agent Brian Sullivan of the D.E.A.
 "Counsel for the claimants pointed out that this witness had numerous convictions for distribution of controlled substances and the witness testified, both on direct and cross-examination, that the State had agreed to recommend probation on a pending marijuana possession *Page 180 
 case, to dismiss a cocaine possession case, and to lower his bond from $100,000.00 to $2,500.00 in consideration of his testimony. The Court finds the testimony of this witness to be credible, however, based upon his convictions, which corroborate his knowledge of practices in the drug trade, and make it reasonable for Gregory Binion to have trusted this witness so as to place him in a position to have observed these incidents. Finally, while on the stand, this witness recited Gregory Binion's telephone number at that residence. . . .
 "This was the telephone number that was used by a cooperating individual to contact Gregory Binion in the presence of Special Agent Sullivan in June 1997. At that time, Special Agent Sullivan monitored a telephone call from the individual to Binion, during which Gregory Binion discussed the purchase of three kilograms of cocaine at a price of $22,500.00 per kilogram. Binion stated during that conversation that he had just purchased two kilograms of cocaine in Birmingham, which he needed to sell before he would purchase more from the cooperating individual. Two weeks later, Binion used the cooperating individual's beeper to contact him from a motel in the Atlanta, Georgia, area. Binion stated that he was ready to purchase one kilogram of cocaine. D.E.A. Agents later seized approximately $21,000.00 and a handgun from Gregory Binion. Calvin Binion claimed ownership of these funds. The currency was later condemned based upon that seizure. The cash seized from Gregory Binion in June 1997 was bundled and packaged in exactly the same manner as all of that seized in this action.
 "Christopher Witherspoon's association of Gregory Binion with Willie Brown, Aundra Hill, Alexious Holliday, and Jonathan Elliott in the drug trade was further corroborated by evidence of investigations and convictions of these individuals with respect to crimes involving drugs. In June 1998, Gregory Binion was arrested in a vehicle registered to his stepfather. In April 1999 (eight months prior to this seizure), Willie Brown was arrested in the same vehicle, two houses away from Gregory Binion's residence at 3116 38th Avenue. At the time of his arrest, several bags of crack cocaine and a pistol were recovered from that vehicle. Reginald Harris also recognized the `street names' of three of these individuals as friends of Binion's who had been to their home. In addition, two photographs of Gregory Binion at a nightclub were recovered from his dresser, wherein he was in the presence of several individuals convicted of drug crimes, including some of those listed above, Damien Jackson, who was with him when he arrived at the residence just prior to the seizure in this case, and Quinnell Trone, whose cellular telephone bill had been directed to the Binion residence for payment.
 "Agent Mike Acker of WANS executed a search warrant at the residence of Willie Brown, and 14 ounces of cocaine were recovered from him. This amount of cocaine has a street value of approximately $40,000.00 No currency was recovered from Brown at that time. Agent Acker testified, based on his experience, that it was unusual to find such a large quantity of cocaine without finding any currency. Willie Brown was 19 years old at the time of this arrest. He lived across the street from Gregory Binion.
 "The search warrant for the Harris/Binion residence also authorized the search of the residence of Aundra Hill. At Hill's residence, 16 grams of cocaine, digital scales commonly used for *Page 181 
 weighing narcotics, and a .380 caliber handgun were recovered from a vehicle parked outside[,] . . . which Hill had been seen driving. The car was registered to Gregory Binion. Hill stated at that time that he did not know Gregory Binion, although Agent Clint Davis of WANS has seen them together on numerous occasions, and a photograph of the two of them on a roller coaster was found in his residence. Hill was also found in possession of more than $4,500.00. He was 18 years of age and unemployed at the time of the seizure. He has since been convicted of unlawful possession of a controlled substance.
 "On December 1, 1999, at the Harris/Binion residence, WANS agents were already present outside the residence when Gregory Binion drove up in the 1991 Lexus. The passenger in the vehicle was Damien Jackson, who also has a record of drug convictions that was admitted into evidence. The keys to the residence were on the key ring with the keys to this vehicle. Narcotics agents recovered, from Gregory Binion's jacket pocket, a set of `postal scales' commonly used for weighing narcotics, according to the testimony of experienced narcotics agents. Agents also recovered a SIG 229 handgun from a secret compartment behind the glove box in the vehicle. As a result, Gregory Binion has been charged and convicted of carrying a concealed weapon, in spite of testimony by his stepfather that the gun was his and that he had had the compartment installed into the vehicle. In his testimony in this case, however, Reginald Harris incorrectly referred to the handgun as a `SIG 129.'
 "Narcotics agents inquired repeatedly of Gregory Binion and of Georgia Harris, as to the location of any money or a safe in the residence; both continually denied, before and after the recovery of the currency in this case, any knowledge of the existence of a safe, and stated that they had no money in the house. Approximately $46,000.00 of the currency was located in a dresser drawer of a bedroom that Gregory Binion initially denied was his, but then admitted it after he was presented with numerous documents, receipts, photographs and other evidence indicating that it was. This money was stacked into $1,000.00 bundles, which were then placed into bundles containing $10,000.00. Each bundle was wrapped with rubber bands in the manner described by Narcotics agents and by Christopher Witherspoon. Two commercial bags of rubber bands like the ones used to bundle the currency were also found on Gregory Binion's dresser.
 "Approximately $120,000.00 was recovered from a floor safe in the spare bedroom after locksmith Robert Skelton was called to open it. Georgia Harris, Reginald Harris, and Gregory Binion had denied knowledge of the combination of the safe, although it was found written on the door facing in the spare bedroom and in Binion's bedroom after the safe was opened. Upon entering the home, Skelton recalled installing the safe at the request of Georgia Harris. She had said that it was for her business, which she had told him was a day-care center or a restaurant, to the best of his recollection. She had paid cash for the safe. The currency in the safe was bundled with rubber bands in the same manner as that recovered from the bedroom.
 "Narcotics agents who participated in the seizure described the currency seized. All of the currency appeared worn, and not as if it had come directly from any financial institution. Photographs of the currency, as it appeared *Page 182 
 when it was seized, were introduced by the State into evidence. It was clear that many of the stacks of currency contained a newer or `large-head' bill on the top. Georgia Harris testified that she had received the currency as a result of her [previous] husband's death in March 1981, and was able at trial to list, with specificity, various sources of the $122,000.00, which she claimed to have deposited into a bank account in 1981. She then claimed to have withdrawn $90,000.00 from the account in 1982 or 1983. She claims she often loaned money to friends, never charging them interest, and that the $120,000.00 was derived from this same sum. The Court finds her claims incredible.
 "Georgia Harris reported to narcotics agents on the night of the seizure, that she owned a day-care center. In fact, she was employed part-time at a day care for several months prior to and following the seizure. Her mortgage payments had been delinquent and her checking account overdrawn prior to the time of the seizure, in spite of her claimed ownership of so much cash which was so readily accessible in her home. She had been unable, in responding to discovery propounded by the State in this case, to name any of the sources of the currency of which she claims ownership in this action. Further, she was unable to explain how the money grew some $30,000.00 over a period of at least 17 years while being stored in her home in shoeboxes and later in a floor safe. The operations manager for AmSouth bank testified that none of the newer or `large-head' bills were introduced into circulation prior to 1996, while Reginald Harris testified that he saw this currency in his wife's home seven years ago. Mrs. Harris stated that Gregory Binion did not have access to the safe, but the combination was openly listed on the door facing in his bedroom, and was listed nowhere in her bedroom or belongings. She also incorrectly described the manner in which the money had been stacked and bundled. Finally, these inconsistencies, coupled with her repeated denials of ownership and the existence of the currency on the night of the seizure, provide additional substantive evidence that the source of the money was illegitimate.
 "Lt. Jeff Snyder, a supervisor with WANS, testified that he took all of the currency seized in this case to the bank to have it officially counted and deposited. The total amount of currency seized was $165,501.00.
 "The Court further finds that Calvin Binion's clams with respect to actual ownership of the 1991 Lexus are incredible. Numerous documents reflecting expensive repairs and improvements by Gregory Binion to the vehicle were found in his bedroom. Calvin Binion clearly had no knowledge of many of the improvements, including the installation of a security device, which the Court had the opportunity to examine. There were also documents inside the vehicle at the time of the Court's examination of it that clearly belonged to Gregory Binion. In addition, there was nothing in the vehicle to indicate that Calvin Binion was a driver of it.
 "Rulings. The Court finds that the registration of the vehicle in Calvin Binion's name is a subterfuge, based on the above-referenced facts. Alabama courts have long recognized as common the practice by individuals involved in the distribution of narcotics, of placing title to their vehicles in the names of others to avoid seizure of such property. See, e.g., Agee v. State ex rel. Galanos, 627 So.2d 960 (Ala.Civ.App. 1993); Felder v. State, 515 So.2d 17 (Ala.Civ.App. 1987). *Page 183 
 Binion was seen driving this vehicle on many occasion, including the date on which it was seized. He made all of the repairs and improvements without his grandfather's knowledge. His grandfather has also previously claimed ownership of property that was seized from Gregory Binion as the result of . . . . its relationship to an attempted drug transaction. The Court finds that Gregory Binion is the actual owner of the vehicle.
 "The Court further finds that Gregory Binion was the actual owner of all the currency seized. There is overwhelming circumstantial evidence in this case that Gregory Binion was involved in a high-profit business of narcotics sales. He was never known to have been employed during the five years during which he was under investigation by WANS, which included regular surveillance by narcotics agents. In spite of his lack of employment, he owned an expensive luxury vehicle, to which he was able to make very expensive improvements. He also had the ability to pay cash for expensive jewelry and a year's membership to an expensive gym in advance, as noted by receipts found on his dresser. Further, $21,000.00 cash was previously seized from him after he had made arrangements to purchase a kilogram of cocaine. In Agee, one factor considered by that Court before condemning the subject property was the improbability of the claimant's saving the amount of money used to purchase it, given his income.
 "The Court is not persuaded by the arguments of Claimants that the State is required to link the actual dollar bills in currency seized in this case directly to a specific drug transaction, and that the vehicle seized must have been specifically shown to have been used in a particular drug transaction in order to be condemned pursuant to § 20-2-93[, Ala. Code 1975]. In fact, the legislature saw fit in 1988 to change the drug forfeiture statute to eliminate the requirement for seizures under the statute, that the individual subjected to the seizure be `found in the act of selling or receiving, or attempting to sell or receive [controlled substances].' Gregory Binion clearly took steps to ensure that he would not be found in such an act, as indicated by the evidence in this case.
 "The Court has considered the arguments on behalf of Claimants that to condemn the currency and vehicle seized in this case would amount to an excessive fine, citing Kelley v. State, 766 So.2d 837 (Ala. 1999). This case is easily distinguished from that holding, based on the extensive amount of evidence before the Court that Gregory Binion was employed in the distribution of narcotics, although he was not in possession of narcotics at the time of the seizure, as was Kelley. Further, the State has alleged in the present case that the car and currency were derived from profits from the sale of illegal drugs, while the Kelley Court specifically indicated that there was no such contention in that case. The author of the Kelley opinion stated that `the forfeiture laws are being used more frequently to punish users like Kelley rather than to punish those higher up the drug distribution chain who are profiting from the sale of illegal drugs — those whom [he] believe[s] the forfeiture laws were intended to punish,' and further, that `[t]here is no question that the intention of the statute was to remove financial reward derived from the sale of drugs. . . .' There is no evidence in this case that tends to even suggest that Binion was merely a drug user. In fact, the evidence in this case was undisputed that Gregory Binion ran a high-profit drug distribution business, *Page 184 
 the sort of business that the legislature meant to address with the current drug forfeiture statute. The Court finds that the 1991 Lexus was used or intended to be used to facilitate violations of the controlled substances laws, as Gregory Binion was driving the vehicle while in possession of postal scales commonly used with controlled substances, and further that the vehicle was derived from proceeds obtained from violations of the controlled substances laws of this state. The Court also finds that the $165,501.00 in currency which was seized on December 1, 1999, in this case likewise was used or intended to be used to facilitate violations of Alabama's controlled substance laws and further that the currency was derived from the proceeds of violations of controlled substances laws.
 "BASED UPON THESE FINDINGS, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the $165,501.00 lawful cash coin or currency of the United States of America is condemned and forfeited to the City of Tuscaloosa for official use by West Alabama Narcotics Squad and against Georgia Binion Harris and Gregory Binion, and that the 1991 Lexus, black/gray in color, VIN# JT8UF11E5M0094283 is condemned and forfeited to the City of Tuscaloosa for official use or to be sold by the West Alabama Narcotics Squad and against Claimant Calvin Binion.
 "The State called this claimant to testify during its case-in-chief, at which time she took the stand and invoked her 5th Amendment rights. She was then called by her attorney to testify during presentation of her case, at which time she took the stand and indicated her willingness, after presentation of all the State's evidence, to waive her rights against self-incrimination. The State objected to the Court's allowing her to testify following her refusal to testify during the State's case and ruling was reserved by the Court for submission of briefs on the issue. Following her cross-examination by the State, however, the State withdrew its objection on this basis to her testimony.
 "Georgia Harris recited the combination at the trial, however.
 "Counsel for Claimants claims that this was improper, as the actual currency seized is no longer available for his inspection, or for the State's identification at trial. The deposit was made pursuant to police department policy, which prevents the storage of currency at police headquarters."
Georgia Harris and Gregory Binion first contend that the search of their residence was not conducted pursuant to a lawful search warrant, as required by Nicaud v. State, 401 So.2d 43 (Ala. 1981). The State argues that this issue was not properly preserved for appellate review, because Georgia Harris and Gregory Binion failed to object at trial to the admission of the warrant or to the admission of any evidence seized pursuant to the warrant. Georgia Harris and Gregory Binion first objected to the search warrant in a motion to dismiss which they filed at the close of the State's case. That objection was not timely. Therefore, the search-warrant issue is not properly before this Court. See Draper v.State, 641 So.2d 1283 (Ala.Crim.App. 1993); Newsome v. State,570 So.2d 703,716 (Ala.Crim.App. 1990) ("Review on appeal is limited to review of questions properly and timely raised at trial.").
Next, Georgia Harris and Gregory Binion argue that the State unlawfully tampered with or destroyed evidence by placing the seized currency in a bank account, without first noting the serial numbers on the currency, thereby commingling the currency with other currency and preventing Georgia Harris and Gregory Binion from examining the currency seized. However, they cite no relevant authority in support of this argument, as they are required to do by Rule 28(a)(5), Ala.R.App.P. "Where an appellant fails to cite any authority for an argument, this Court may affirm the judgment as to those *Page 185 
issues. . . ." Sea Calm Shipping Co. v. Cooks, 565 So.2d 212, 216 (Ala. 1990).
Georgia Harris, Gregory Binion, and Calvin Binion argue that the State failed to present sufficient evidence that the currency or the vehicle seized was used in violation of the Alabama Uniform Controlled Substances Act. In Robbs v. State ex rel. Whetstone, 674 So.2d 1301, 1302-03
(Ala.Civ.App. 1995), the Court of Civil Appeals correctly stated the relevant legal principles:
 "In a § 20-2-93, Ala. Code 1975, forfeiture proceeding, the State may establish a prima facie case by showing that the item to be forfeited was used, or intended to be used, in violation of the Alabama Uniform Controlled Substances Act. Culpepper v. State, 587 So.2d 359 (Ala.Civ.App. 1991). The standard of that proof is reasonable satisfaction. Agee v. State ex rel. Galanos, 627 So.2d 960 (Ala.Civ.App. 1993). . . .
 "When evidence is presented ore tenus, the judgment of the trial court is presumed correct and will be affirmed if it is supported by competent evidence, unless it is shown to be palpably wrong. Culpepper."
In a statement entirely applicable to this case, the Court of Civil Appeals has described the burden of proof regarding the forfeiture of seized currency:
 "In the present case the State had the burden of proving that the currency seized was either (1) money furnished or intended to be furnished by any person in exchange for a controlled substance in violation of any law in this state, or (2) proceeds traceable to such an exchange, or (3) money used or intended to be used to facilitate a violation of any law of this state concerning controlled substances. § 20-2-93(a)(4). The standard of proof was reasonable satisfaction. State v. Smith, 578 So.2d 1374
(Ala.Civ.App. 1991). The trial court found that the State met its burden of proof."
$1,568.00 U.S. Currency v. State, 612 So.2d 497, 499 (Ala.Civ.App. 1992).
We conclude that the judgment of the trial court is supported by competent evidence, set forth in painstaking detail in its order, insofar as the forfeiture of the currency is concerned. The trial court's findings with regard to the currency are not palpably wrong.
However, we conclude that, insofar as the forfeiture of the automobile is concerned, the judgment of the trial court is so unsupported by the evidence as to be plainly and palpably erroneous. Therefore, to the extent that the trial court's judgment ordered the forfeiture of the 1991 Lexus automobile, the judgment is reversed.
The State produced evidence sufficient to support the trial court's finding that Gregory Binion is the actual owner of the automobile. In fact, Calvin Binion and Gregory Binion do not challenge that finding in their briefs filed with this Court. However, proof of ownership alone does not support the forfeiture of the vehicle. While the State argues that the automobile was used repeatedly in Gregory Binion's drug transactions, the State can point to no evidence tending to support that conclusion. There were no drugs in the automobile when it was seized. There was no evidence indicating that any drug transaction had taken place immediately before the seizure. There was no evidence indicating that the automobile had been used to transport a controlled substance. Finally, there was no evidence indicating that the automobile had been purchased with the proceeds from any violation of any law of this State concerning controlled substances. *Page 186 
Finally, Georgia Harris and Gregory Binion argue that the forfeiture of the currency constitutes an excessive fine, in violation of theEighth Amendment to the United States Constitution. A forfeiture violates the excessive-fines clause if it is "grossly disproportional to the gravity of a defendant's offense." United States v. Bajakajian, 524 U.S. 321,334, (1998). See Ex parte Kelley, 766 So.2d 837, 839 (Ala. 1999) (discussing and applying the Bajakajian standard). Georgia Harris and Gregory Binion's excessive-fine argument has no merit.
The trial court found "overwhelming circumstantial evidence . . . that Gregory Binion was involved in a high-profit business of narcotics sales." The trial court also found that "Gregory Binion ran a high-profit drug distribution business, the sort of business that the legislature meant to address with the current drug forfeiture statute." We note that the fines for those convicted of trafficking in cocaine range from $50,000 to $250,000, depending upon the quantity of the controlled substance. Therefore, we cannot conclude that the forfeiture of $165,501 is an excessive fine prohibited by the Eighth Amendment to the United States Constitution.
The judgment of the trial court is affirmed insofar as it ordered the forfeiture of the currency; it is reversed insofar as it ordered the forfeiture of the automobile. This case is remanded for the entry of an order or for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Moore, C.J., and Houston, Lyons, and Johnstone, JJ., concur.
[1] There is no explanation in the record or in the parties' briefs as to why Georgia Harris claims ownership of $120,000 and Gregory Binion claims ownership of $35,501; these two figures total only $155,501, leaving $10,000, of the total $165,501 forfeited, unclaimed.