Fredrick L. King and Angela Goode appeal the trial court's judgment ordering the forfeiture of $9,333 in United States currency that law-enforcement officers seized during an investigation into King's suspected distribution of cocaine. We reverse.
On March 15, 2005, the State of Alabama filed a complaint seeking the condemnation and forfeiture of $9,333 in United States currency pursuant to § 20-2-93, Ala. Code 1975. The State alleged that the money was furnished or intended to be furnished in exchange for a controlled substance. On April 11, 2005, King and Goode filed an answer denying that the money was derived from a violation of the controlled-substance laws of Alabama. King and Goode also filed a claim to the money; King claimed ownership of $833, and Goode claimed ownership of the remaining $8,500. On June 30, 2005, the trial court conducted an ore tenus hearing. On July 13, 2005, the trial court entered a judgment condemning the $9,333. King and Goode filed a postjudgment motion; after conducting a hearing, the trial court entered an order denying the postjudgment motion. King and Goode timely appealed to this court.
The only testimony presented by the State was that of Jim England, a member of the Morgan County Sheriffs drug task force. England testified that in early 2005 two informants told agents with the task force that they had purchased cocaine from King in the past. Prior to the informants' bringing King to the agents' attention, the agents had never heard of King. England testified that King did not have a reputation as a drug dealer in the community.
On the morning of February 17, 2005, the agents sent one of the informants into King's house to obtain narcotics. King told the informant that he did not have the drugs at the house; thus, King drove to another location to get the drugs. Upon King's return, he gave the informant four and one-half ounces of crack cocaine. The informant did not pay for the narcotics at that time because it was a transaction in which King "fronted" the drugs in anticipation of the informant's paying King at a later time. The informant gave the drugs to the agents, and the agents obtained a search warrant for King's residence.
Four or five hours after the first transaction, the agents had the same informant return to King's house in order to obtain more narcotics. Unlike the previous transaction, the second controlled buy was not a "front" deal. As such, the agents gave the informant $9,000 in marked United States currency. The informant entered the house and left shortly thereafter; an agent met the informant in the driveway as soon as the informant exited the house. The informant gave the agent two plastic bags containing a total of approximately eight ounces of powdered cocaine. The record is unclear whether King drove to another location in order to obtain the narcotics involved in the second transaction.
At that time, the agents entered the house in order to execute the search warrant. England testified that as they entered *Page 969 
the house, the agents saw Goode sitting on a couch with several children. King was running down a hall toward the master bedroom; he had in his hands a paper bag from a fast-food restaurant. The agents followed King into the bedroom, where King stopped running after he threw the bag on the floor. The bag contained the $9,000 in marked United States currency that the agents had given the informant.
The agents detained King and began searching the house. The agents found no illegal drugs, drug paraphernalia, scales, or other indicia of the illegal drug trade in the house. The agents did find a .38 caliber handgun, $833 in United States currency in King's wallet, and $8,500 in $100 bills hidden in a pocket of a large leather jacket in the closet in the master bedroom. At the time of the raid, neither King nor Goode claimed ownership of the $8,500 found in the jacket. The agents confiscated all of the money and the handgun; King and Goode do not challenge the agents' confiscation of the handgun. King was charged with trafficking in cocaine; Goode was not charged with any offenses.
Goode initially testified that, at the time of the raid, she worked as a housekeeper at a local health-care facility. However, Goode later stated that she was working for another company at the time in question. Despite questioning her place of employment, the State did not dispute that she was working at the time of or before the incident. Goode testified that she had been saving the $8,500 for five years for a down payment on a house. She stated that she had attempted to purchase a house but that she could not secure financing. Goode testified that, at the time of the raid, she did not tell the agents that the $8,500 belonged to her because she was nervous; she did, however, at the time of the raid claim ownership of the vehicle in the driveway.
England testified that King told him that he was receiving Social Security disability income. Goode testified that King had been receiving Social Security disability income for approximately four years and that the $833 in King's wallet came from his disability check. England testified that the State did not seek the forfeiture of the house or the vehicle in which King drove to get the drugs during the first controlled buy.
The trial court noted in its judgment that it was "reasonably satisfied" that the $9,333 was "furnished or intended to be furnished . . . in exchange for controlled substances." The trial court based its judgment on the fact that the informant conducted two controlled buys within a short period of time, that the second buy involved a "relatively large quantity of cocaine," that King did not work and was on disability, that the $8,500 was found in a closet in the same room as King, and that the nature of Goode's employment and her "lack of any detailed explanation" for acquiring the money caused her story to "just . . . not add up." The trial court's judgment incorrectly stated, however, that crack cocaine and powdered cocaine had been found in the house as a result of the execution of the search warrant.
In its order denying King and Goode's postjudgment motion, the trial court acknowledged that there was strong circumstantial evidence of the money's relation to the drug trade, but it acknowledged that the State had failed to "trace the [$9,333] to any one or more specific drug transactions." The trial court stated that to require the State to show a direct link between the currency at issue and the drug trade would result in large amounts of currency "rarely" being forfeited in cases such as this one. *Page 970 
On appeal, King and Goode argue that the trial court's judgment of forfeiture is due to be reversed. On appellate review of a ruling from a forfeiture proceeding at which the evidence was presented ore tenus, the trial court's judgment is presumed to be correct unless the record shows it to be contrary to the great weight of the evidence. Holloway v. State ex rel.Whetstone, 772 So.2d 475, 477 (Ala.Civ.App. 2000). Section20-2-93(a)(4), Ala. Code 1975, under which the State obtained forfeiture of the $9,333 in currency, provides for forfeiture of
 "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of any law of this state; all proceeds traceable to such an exchange; and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of any law of this state concerning controlled substances."
"`"Under § 20-2-93 the State must establish a prima facie case for the seizure, condemnation, and forfeiture of the property. The standard of proof is reasonable satisfaction. The statute is penal in nature and, as such, should be strictly construed."'" Ex parte McConathy, 911 So.2d 677, 681
(Ala. 2005) (quoting Holloway v. State ex rel.Whetstone, 772 So.2d at 476, quoting in turn State v.Smith, 578 So.2d 1374, 1376 (Ala.Civ.App. 1991)).
In Gatlin v. State, 846 So.2d 1090
(Ala.Civ.App. 2002), this court discussed Alabama caselaw dealing with the forfeiture of property as a result of a person's involvement with the illegal drug trade. The Gatlin court noted:
 "The mere proximity of the drugs to the cash in Gatlin's vehicle did not satisfy the State's burden of proof. See Thompson v. State, [715 So.2d 224
(Ala.Civ.App. 1997)]. Our forfeiture cases have found the following circumstances to be indicative of contemplated or completed drug transactions: a large quantity of drugs, see, e.g., Shepherd v. State, 664 So.2d 238 (Ala.Civ.App. 1995) (21 pounds of marijuana); drugs packaged for sale, see, e.g., Pointer v. State, 668 So.2d 41 (Ala.Civ.App. 1995); drug paraphernalia or accouterments indicating sale, such as `baggies' or scales, see, e.g., Johnson v. State, 667 So.2d 105, 108 (Ala.Civ.App. 1995). . . ."
Gatlin v. State 846 So.2d at 1092-93.
King and Goode argue that the State did not present any evidence linking the $9,333 to a transaction involving controlled substances. In support of their argument, King and Goode rely heavily on Ex parte McConathy, supra. InMcConathy, a suspect bought 23 Xanax pills from an informant, and the police detained the suspect shortly after the transaction. The police searched the vehicle that the suspect was driving and found numerous pharmaceutical pills for which the suspect did not have a prescription, $8,000 in United States currency, and a $9,000 cashier's check.
The police sought the forfeiture of the $8,000 pursuant to § 20-2-93, Ala. Code 1975. The trial court conducted an ore tenus hearing at which the suspect testified that, at the time of the incident, he was earning $6.15 per hour and that he had recently sold a piece of developed real property from which sale he realized a $12,000 gain. He stated that the $8,000 in United States currency was a part of the $12,000, and that the $9,000 cashier's check came from the sale of equipment related to the real property. A police officer testified that the suspect told the police that he planned to continue buying drugs with the $8,000.
The trial court entered a judgment of forfeiture, and this court affirmed, without *Page 971 
an opinion. McConathy v. State (No. 2021203, June 18, 2004), 915 So.2d 1184 (Ala.Civ.App. 2004) (table). Our supreme court reversed. Ex parte McConathy,911 So.2d at 688. The supreme court stated that "McConathy presented undisputed evidence as to the source of the seized currency, and the officers were unable to trace the currency to `any specific drug transaction or any transaction [in] violation of the Alabama controlled substances law.'" 911 So.2d at 687-88
(quoting Holloway v. State ex rel. Whetstone,772 So.2d at 477). Quoting Gatlin v. State, 846 So.2d at 1093, the supreme court noted that "`mere suspicion is insufficient to support a judgment of forfeiture.'" Ex parteMcConathy, 911 So.2d at 688. The supreme court concluded that, because the State had presented "no concrete evidence tying the $8,000 to a specific drug transaction," the trial court's judgment of forfeiture was due to be reversed.Ex parte McConathy, 911 So.2d at 688.
The State argues that the facts of this case are similar to facts of Harris v. State, 821 So.2d 177 (Ala. 2001). InHarris, police conducted an extensive investigation into an elaborate drug-selling operation. As a result of the investigation, the police arrested several people and confiscated illegal drugs, scales, weapons, a vehicle, and $165,501 in United States currency. The police sought the forfeiture of the vehicle and the currency. The trial court conducted an ore tenus hearing at which numerous witnesses testified. One witness testified that, for at least seven months, he had been receiving large amounts of cocaine from the people involved in the scheme. He also testified that he saw several other people taking large amounts of cocaine out of one of the houses involved in the scheme and bringing large amounts of money into the house. The witness saw the money taken into an extra bedroom in the house; during their search, the police discovered a floor safe in that room containing $120,000 of the confiscated money.
The State presented evidence indicating that all of the money was stacked in bundles of $1,000, with the bundles in turn stacked in $10,000 bundles, a manner commonly used by drug dealers. Further, the State presented evidence that one of the drug dealers had been arrested two years before with approximately $21,000 that was bundled in the same manner.
One of the people arrested claimed that she had received $90,000 of the $122,000 that she claimed as a result of her husband's death 17 years before. However, she was unable to offer any explanation as to how the money increased by more than $30,000 while it sat in shoe boxes under her bed and later in the floor safe. Though the trial court acknowledged that there was no evidence linking the specific bills to a drug transaction, it found that there was "`overwhelming circumstantial evidence'" linking the money to the drug trade.Harris v. State, 821 So.2d at 183.
Our supreme court affirmed the trial court's judgment of forfeiture as to the $165,501. Harris v. State,821 So.2d at 185. The court noted that the trial court's judgment as to the money was supported by competent evidence. The supreme court reversed the trial court's judgment as to the seized vehicle, however, because, despite the presence of scales and a weapon in the vehicle, the State could point to no evidence tending to show that the vehicle was used in a specific transaction. The court noted that "[t]here was no evidence indicating that the automobile had been used to transport a controlled substance" or that proceeds from a sale of narcotics had been used to purchase the vehicle. 821 So.2d at 185.
In Agee v. State ex rel. Galanos, 627 So.2d 960
(Ala.Civ.App. 1993), this court examined whether a defendant's proffered reasons behind the origin of confiscated *Page 972 
property was credible in light of his income and other presented evidence. In Agee, police arrested the defendant for drug-related offenses and confiscated a vehicle allegedly purchased with money obtained in exchange for narcotics. The defendant claimed that he saved the money "over a period of five to ten years." 627 So.2d at 962. In its judgment, the trial court detailed the defendant's involvement in the drug trade and his habit of purchasing vehicles with money obtained from his drug sales. Moreover, the trial court gave a detailed account of how the defendant purchased the vehicle at issue in the case; the trial court's findings regarding the relationship of the seized vehicle to the illegal drug trade was in stark contrast to the evidence presented by the defendant.
The trial court entered a judgment of forfeiture, and this court affirmed. Agee v. State ex rel. Galanos,627 So.2d at 963. This court discussed the detailed evidence presented by the State and also noted that the trial court had found that the defendant had "testified falsely and that his testimony was unbelievable. Other evidence reflected] that it would have been improbable for [the defendant] to save that amount of money given his annual gross income, which averaged around $10,000." 627 So.2d at 962. Further, this court noted that where "there is conflicting ore tenus testimony, it is the duty of the trial court to resolve the conflict and to render a judgment accordingly." 627 So.2d at 962-63.
The facts of this case are distinguishable from those ofHarris and Agee.Unlike Harris, no witness described frequently seeing money coming into the house in exchange for drugs. Other than the $9,000 in United States currency provided by the agents, the State presented no evidence linking any of the money in the house to illegal drugs. The informants did not tell the police that they had seen King take money into the bedroom or that they had seen any money at all come into the house. Likewise, the State presented no evidence indicating that the money was stacked in bundles or in some other way frequently used by drug dealers. While the State implied that the jacket belonged to King, it offered no evidence in support of that contention. In Harris, the State presented "`overwhelming circumstantial evidence'" that the money was linked to the drug trade (821 So.2d at 183); here, the State presented no evidence at all regarding a connection between the money at issue and an illegal drug transaction.
Unlike in Agee, the State presented no evidence contradicting Goode's claims. The State failed to offer any evidence as to the amount of King's disability payments or as to Goode's income. In Agee, evidence was presented that was in stark contrast to the defendant's claim that he had saved the money used to purchase the vehicle; here, the State offered no evidence to refute the claims made by King and Goode.
England provided a step by step account of the raid on King's house. His testimony left no doubt that King violated the laws of Alabama when he provided a substantial amount of cocaine to the informant. While England's testimony detailed King's actions over a period of four or five hours, the State provided the trial court no evidence regarding the money at issue. England showed the trial court a photograph of the money after the agents had "fanned [it] out"; however, the State failed to offer any evidence related to the manner in which King or Goode stored the money. No witness testified that King had any prior involvement in the drug trade or that he hid money related to the drug trade in the master bedroom of his house.
In this case, England testified that, before the events on which this appeal focuses, *Page 973 
the police were unaware of King's involvement with the drug trade. Goode was charged with no crime in connection with the illegal drug transaction. The State presented no evidence of Goode's involvement in the illegal drug trade, and the State did not offer any evidence suggesting that the $8,500 did not, in fact, belong to Goode. Goode testified that she had been saving money in an effort to buy a house and that the $833 in King's wallet came from his disability income. King and Goode presented undisputed evidence as to the origin of the seized money.
The State in this case has shown no link, either direct or circumstantial, between the seized money and a drug transaction. The agents found no illegal drugs, other than those involved in the underlying transaction. Though they searched the house, the police did not locate any drugs, scales, or other indicia of the illegal drug trade. See Pointer v. State, supra. King had just completed an illegal transaction; however, the money related to that transaction is not at issue in this case.See McConathy, 911 So.2d at 681.
While we acknowledge the strong presumption of correctness afforded a trial court's findings of fact in cases such as this, the trial court's judgment must be supported by the evidence presented. See Ex parte McConathy, supra. The State presented no evidence indicating that the seized currency was related to a transaction involving illegal drugs. At best, the evidence indicated that the State merely suspected that the money was connected to the drug trade. See Ex parteMcConathy, 911 So.2d at 688.
REVERSED AND REMANDED.
All the judges concur.