The State of Alabama, by and through the district attorney's office for the 18th Judicial Circuit, Shelby County, sought and obtained an order of forfeiture of $8,000 in currency, the property of Jeffrey *Page 678 
Daren McConathy,[1] which was seized following his detention for possession of a controlled substance, Xanax. McConathy was detained after he purchased 23 Xanax pills at a price of $3.00 per pill from an informant for the Alabaster Police Department. McConathy appealed. The Court of Civil Appeals affirmed, without an opinion. McConathy v. State (No. 2021203, June 18, 2004), ___ So.2d ___ (Ala.Civ.App. 2004) (table). This Court granted McConathy's petition for a writ of certiorari to determine whether the decision of the Court of Civil Appeals conflicts with prior decisions setting forth the burden of proof the State must carry in order to obtain a civil forfeiture of seized items. We reverse and remand.
 Facts
The State, on behalf of the Alabaster Police Department, filed a petition in the Shelby Circuit Court on January 8, 2003, for civil forfeiture of $8,000 seized from McConathy based on a consent to forfeiture signed by McConathy. McConathy was served with the petition on January 14, 2003; he filed an answer on January 22, 2003, in which he denied that the money was due to be forfeited. On May 21, 2003, McConathy filed a motion for leave to amend his answer, which was also the amended answer. In this document he withdrew his consent to forfeiture and asserted that the consent form was executed without consideration and that it was signed under duress. He also asserted that, if the court determined the money seized was contraband, forfeiture of the money would constitute a violation of the excessive-fines clause of the Eighth Amendment of the United States Constitution. He requested an evidentiary hearing on the issue of the admissibility of the consent to forfeiture.
On May 22, 2003, the circuit court executed a judgment of forfeiture, which was filed with the clerk and entered on May 23. On June 18, McConathy filed a motion to set aside the judgment, to which he attached an affidavit, and a motion for a judgment as a matter of law.[2] The court set all pending motions for hearing on July 14, 2003. Following a hearing on July 14, the court granted McConathy's motion and set aside the judgment of forfeiture that had been entered on May 23, 2003. The case was set for trial on August 4, 2003.
At trial, the evidence revealed the following. On December 18, 2002, a confidential informant working with the Alabaster Police Department contacted Officer Jason Boyd and informed him that McConathy had stopped him on a roadway and had asked to purchase some Xanax pills from him. McConathy indicated to the informant he was willing to buy 60 pills at $3.00 per pill. Officer Boyd obtained some Xanax pills and had the informant place a telephone call to McConathy to set up a buy, which was to occur in the parking lot at a grocery store in Alabaster. The telephone call was recorded.
The informant was wired so officers could listen to and record the transaction between the informant and McConathy. At approximately 3:00 p.m. McConathy met the informant and gave him $67 cash. The informant gave McConathy 23 Xanax pills.[3]
When the informant drove away *Page 679 
from the parking lot, Officer Boyd, Lieutenant Curtis Rigney, and Detective Chuck Bradley (hereinafter referred to collectively as "the officers"), according to Officer Boyd, approached and detained McConathy. They did not arrest him. They asked him where the pills were; McConathy told the officers the pills were in the console of the van being operated by McConathy. A bottle was seized that contained 10½ pills containing hydrocodone, 5 unknown pink pills, 22 Xanax pills,[4] 2 unknown yellow capsules, 20 pills containing clonazepam, 1 red capsule labeled Ethix 027, and some fragments of a blue pill. Also seized at the scene, according to Officer Boyd, was a bank bag that contained $8,000 cash and a cashier's check in the amount of $9,000. The drugs and the van were secured.
McConathy was taken to the police station, where he was advised of his Miranda[5] rights by Officer Boyd. McConathy executed a written notification-of-rights form at 3:52 p.m. He did not request an attorney. Lt. Rigney and Det. Bradley were present off and on during the questioning. The interview, which lasted 1 hour and 48 minutes, was recorded. McConathy had taken one Xanax before he was taken into custody. During the interview McConathy was apprehensive. The officers explained his situation to him, told him that he was not under arrest, and explained his rights to him.
McConathy had previously been an officer with the Alabaster Police Department, so he and the officers knew each other. They discussed his need and desire to get help for his drug problem.
During the interview McConathy was told that the $8,000 and the van would be held as evidence and that the $9,000 cashier's check would be returned to him. At the conclusion of the interview McConathy was asked to sign a consent-to-forfeiture form, the subject of which was the van and the cash.
The officers determined that the vehicle belonged to another individual, not to McConathy. They requested that McConathy return to the police station the next day and execute a second consent-to-forfeiture form, which included the cash only. McConathy was told this was for housekeeping purposes only and that the cash and the van had to be listed separately. During the second interview on December 19, McConathy told the officers that he had spent $25,000 on drugs in the last two and one-half years.
Officer Boyd could not remember with certainty when and where the cash and the cashier's check were seized. He believed the cash, when seized, was inside a blue bank-deposit bag that was in the passenger seat of the van while they were still at the scene and that the check was seized at Lt. Rigney's office after McConathy emptied his pockets. According to McConathy, the cash and the cashier's check were both in the bank-deposit bag, which he says was in his rear pocket and was seized at the police station. The $67 in cash was also held as evidence. No attempt was made to forfeit this money.
At trial, McConathy testified that he had formerly worked for the Alabaster Police Department for seven years. At the time of the incident, McConathy had been employed at Express Oil Change for seven *Page 680 
months; his regular rate of pay was $6.15 per hour, and he was paid $9.22 per hour for overtime. He had successfully passed a pre-employment drug test as well as a drug test administered on February 1, 2003.
McConathy testified he was under a lot of stress at the time of the incident. His father had been sick and the doctors were uncertain whether he had cancer. His father had turned his oil-change business, Performance Fast Lube, over to McConathy. His father had had a partner in the business, who became McConathy's partner, who had "extorted" (apparently somehow stole) $55,000 from the business. McConathy was unable to pay his current bills or his personal debts or the debts associated with his father's business. Four and one-half years previously McConathy was involved an accident involving a four-wheeler. His doctor prescribed pain medications — hydrocodone and Lortab — which he had been taking for three years. He was also taking Klonapin for anxiety or nerves.
The property on which the Performance Fast Lube business was located was near foreclosure when McConathy was able to arrange a sale of the property. The property was transferred to Dennis O'Brien in exchange for O'Brien's paying off numerous debts and judgments and paying McConathy some money in addition. The sale of the property closed on December 8, 2002. McConathy presented a closing statement that showed that he received a check for $12,000 at the closing. According to McConathy the $8,000 cash was from the sale of the property. The $9,000 cashier's check was from Elizabeth Carden for the sale of the equipment in the Performance Fast Lube building. McConathy testified he was using money from his paycheck from Express Oil Change to purchase the drugs.
At trial, McConathy testified that he had no intentions of spending the $8,000 to purchase drugs. Instead, he intended as of his detention on December 18, 2002, to obtain help for his drug problem. He stated that he had, in fact, gotten help at University of Alabama at Birmingham Hospital.
The officers never informed McConathy of the forfeiture laws. He later consulted an attorney and was told that the $8,000 was not contraband.
The officers reached an agreement with McConathy under which he would work as an informant and purchase drugs from other individuals. He made one buy without the officers' prior knowledge, and he turned over only 10 of the 12 pills he had purchased. He was allowed to continue his assistance, however, and subsequently made two controlled buys of Lortab from a black male who was never identified because the police wanted to keep McConathy's identity confidential; this case was never prosecuted. McConathy assisted the police department in securing the forfeiture of the van he was driving when he was detained by making a controlled buy of cocaine from the owner of the van. The officers made McConathy's cooperation known to the district attorney's office.
On August 12, 2003, the court entered a new judgment of forfeiture; that judgment stated:
 "This matter came before the Court on August 4, 2003 for trial and upon the testimony and evidence presented, the Court finds in favor of the Plaintiff and orders, adjudges and decrees as follows:
 "1. $8,000.00 un [sic] U.S. Currency was used, or intended to be used, to facilitate the violation of the controlled substance laws of the State of Alabama, and/or is considered to be proceeds from the illegal sell *Page 681 
[sic] of controlled substances, in violation of the laws of this State, and said property is, therefore, due to be forfeited and condemned.
 "2. The property described in Paragraph 1 above is declared contraband, condemned and forfeited to the Alabaster Police Department in accordance with the provisions of 1975 Code of Alabama [, §] 20-2-93(e) for the use and benefit of the same and/or the proceeds from the sale of said property to be for the use and benefit of the same.
 "3. All, right, title, and interest of the Defendant Jeffrey McConathy in and to said property is hereby divested from said Defendant and is vested in the Alabaster Police Department pursuant to applicable law.
 "4. Cost of Court are taxed to the Alabaster Police Department."
 Standard of Review
On appellate review of a ruling from a forfeiture proceeding at which the evidence was presented ore tenus, the trial court's judgment is presumed to be correct unless the record shows it to be contrary to the great weight of the evidence. Holloway v.State ex rel. Whetstone, 772 So.2d 475 (Ala.Civ.App. 2000).
 Analysis
Section 20-2-93(a)(4), Ala. Code 1975, under which the State obtained forfeiture of the $8,000 currency provides for forfeiture of
 "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of any law of this state; all proceeds traceable to such an exchange; and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of any law of this state concerning controlled substance."
McConathy argues that the State failed to make a prima facie case justifying forfeiture of the $8,000 in this case. He acknowledges that he purchased a quantity of a controlled substance for $67. He contends the controlled substance was found in the console of a van he was operating and that a bank bag containing $8,000 in currency and a cashier's check for $9,000 was taken from his person. Further, he argues there was no evidence, or even a contention by the State, that he was a drug "dealer." McConathy testified and provided documentary proof that the $8,000 was the proceeds from the sale of commercial property that had closed approximately 10 days before the seizure. He testified that he had no intention of purchasing $8,000 worth of drugs at the present time or in the future but that his intention was to get help for his drug addiction.
The State does not contend that McConathy was a drug dealer; it agrees that he was only a purchaser of drugs. It does not assert that he purchased $8,000 worth of drugs during the incident in question or that there was any discussion of his purchasing $8,000 worth of drugs on that occasion. The State agrees that McConathy purchased 23 pills for $67. Officer Boyd testified specifically that the $8,000 had absolutely nothing to do with the transaction that occurred on December 18, 2002.
"`Under § 20-2-93 the State must establish a prima facie case for the seizure, condemnation, and forfeiture of the property. The standard of proof is reasonable satisfaction. The statute is penal in nature and, as such, should be strictly construed.'" *Page 682 Holloway, 772 So.2d at 476 (quoting State v. Smith,578 So.2d 1374, 1376 (Ala.Civ.App. 1991)). The State relies on three factors to justify the forfeiture: (1) the $8,000 was found in McConathy's possession immediately following a controlled-substances buy; (2) McConathy had a supply of pills in his possession, some of which were the Xanax he had just purchased from the informant; and (3) during his conversation with the officers, McConathy expressed his intent to continue purchasing controlled substances.
Although the $8,000 was found in McConathy's possession immediately after he had purchased the Xanax pills, there was no evidence linking the $8,000 to McConathy's purchase of 23 Xanax pills for $67. The State also does not dispute that the $8,000 was what remained from McConathy's sale of the Performance Fast Lube oil-change business. The mere presence of money in the proximity of controlled substances is insufficient to justify the forfeiture of the money. Gatlin v. State, 846 So.2d 1090
(Ala.Civ.App. 2002).
McConathy did have a supply of pills in his possession when he was detained; however, he presented testimony, which the State did not refute, that he had prescriptions for at least some of those pills other than the Xanax. McConathy does not dispute that he illegally possessed 23 Xanax pills, which he purchased for $67. As discussed above the State established no connection between the 23 Xanax pills and the $8,000 in cash.
The remaining factor upon which the State relies is that during a conversation with the officers, McConathy indicated that he intended to continue purchasing controlled substances. McConathy disputes this claim. There is no direct link between the $8,000 and the supposed future purchase of controlled substances. Concerning this argument the State relies solely on the language of the statute that authorizes forfeiture of money "intended to be used to facilitate any violation of any law of this state concerning controlled substance." § 20-2-93(a)(4), Ala. Code 1975.
The evidence presented relative to this issue at trial was as follows:
 "Q. [Prosecutor:] After you were back in Lieutenant Rigney's office and you had conducted — or during the process of conducting the first interview on December 18, did you discuss the $8,000 and the check and the vehicle that were seized subsequent to his arrest?
 "A. [Officer Boyd:] Yes, ma'am. We talked to Mr. McConathy in reference to what had transpired that day as far as in purchasing the pills and that the $8,000 cash would be held as evidence, that he could have the check back and also that the van would be held for evidence.
 "Q. Okay. And did you give him any reasons for holding onto the $8,000 and returning the check?
 "A. Well, he was presented with a form, the consent-to-[forfeiture] form. And it also had the van that was a Chevy van also included. Once he was handed the form — well, I asked him, you know, if he was going to continue to buy pills he said, yes, you know. And I had asked him if — if he used the money that he made from, you know, getting paid at the shop to buy the pills and he said yes.
 "So, I mean, I didn't tell him point blank maybe the $8,000 — why it was being taken per se. But he was given the form and I was — I told him — Lieutenant Rigney told him to read it and I was satisfied that he understood what it meant because he looked at it for just a second, then looked at Lieutenant Rigney and said so you're keeping the van. So I knew that he understood that it was taking property is what it meant.
". . . . *Page 683 
 "Q. Okay. At some point did — was there any discussion about getting the defendant some help for his drug problem or —
 "A. I think he was told that he probably needed to seek some help. I don't recall exactly what was said.
 "Q. If you don't recall that's fine. And did the defendant ever indicate that he would have used that money to buy drugs?
"A. He led us to believe that.
 "Q. The — there is something we need to go back to just very briefly. At the time that the confidential informant agreed to sell Mr. McConathy the Xanax he had indicated according to your testimony that he wanted more than he could supply. Do you recall how much that was?
 "A. Well, the original prescription what the informant stated he was going to get filled was for 60. Mr. McConathy told him he was willing and able to buy all 60 at the same $3.00 a piece.
 "Q. Did Mr. McConathy indicate the scope of his drug problem? How much drugs was he using at the time if you recall?
 "A. Based on his own statements from December 19 he told us that in the last two to two and a half years he had spent $25,000.
". . . .
 "Q. [McConathy's attorney:] On the date in question we are talking about December 18, 2002, did you arrest anybody for a drug transaction involving this money and when I mean this money I'm talking about the $8,000.
"A. [Officer Boyd:] I don't understand your question.
 "Q. My question is was $8,000 worth of drugs purchased on that date?
"A. No.
 "Q. Okay. Was there any kind of conversation prior to the actual purchase on that date between Mr. McConathy, anybody to your knowledge, of purchasing $8,000 worth of drugs?
"A. No.
 "Q. Okay. So basically what we have got here is you arrested Mr. McConathy for purchasing how much drugs?
"A. He was not arrested, he was just [detained].
 "Q. Well, even if he wasn't arrested on December 18 a transaction occurred?
"A. Uh-huh.
 "Q. A transaction between your informant . . . and Mr. McConathy and it was for 23 Xanax tablets; is that correct?
"A. Correct.
"Q. And the purchase price was $67; is that correct?
"A. It was actually sixty-nine.
 "Q. Sixty-nine. Okay. Sixty-nine, sixty-seven. How much money did you receive?
"A. Sixty-seven.
 "Q. Okay. And at this point is this $67 — well, let me rephrase this. The $8,000 we are talking about, is that $67 a part of this $8,000?
"A. I'm not sure.
"Q. You are not sure. Where is the $67 then?
"A. It's secured in my office.
 "Q. Has any forfeiture proceedings been filed against the $67?
 "A. No. It's being held as evidence along with the criminal aspect of the case.
 "Q. So, this $8,000, which was found with another $9,000 check in a bank bag had absolutely nothing to do with this transaction on December 18, did it?
"A. Not with the transaction, no. *Page 684 
 "Q. Okay. That's — okay. Did you or to your knowledge anybody else that you worked with in the narcotics unit trace the $8,000 in question back to any specific drug transaction in violation of the controlled substance laws?
"A. I'm not sure how you would trace currency.
 "Q. Well, it's simple. If an $8,000 — if a person was selling $8,000 worth of drugs and you as a narcotics officer was providing the moneys for that you would write down a serial number, would you not? You would be able to trace that money if it — if at some point subsequent to the actual transaction you may have done a search warrant or something else and you may have recovered some moneys you would be able to trace that money back to your original deal, is that not correct?
 "A. Not to get out of line, sir, but most drug dealers don't write down their serial numbers.
 "Q. No, I'm not asking about drug dealers I'm asking about if you were providing the funds to purchase drugs.
"A. Uh-huh.
"Q. Would you not write down the serial numbers?
"A. Probably.
 "Q. And we're not talking about Mr. McConathy being a drug dealer, we're talking about Mr. McConathy purchasing drugs?
"A. Right.
 "Q. So, my question is, once again, is that $8,000 did you or anybody else to your knowledge, trace this money back to a specific drug transaction?
"A. Not to a specific drug transaction.
"Q. Did you try to do that?
 "A. I mean I don't — I understand what you said, but I don't see a way to trace currency.
"Q. Yes or no?
"A. No.
 "Q. So, once again, other than the transaction on December 18 for the purchase of 23 Xanax pills for $67, this money has nothing to do with that transaction; is that correct?
"A. The transaction, no.
". . . .
 "Q. And when you asked — and then after — at some point, obviously, he signed the consent-to-[forfeiture] form. But during that interview he asked about the money on several occasions, is that not correct?
"A. You talking about —
 "Q. We're talking about the 18th that we have the videotape of.
 "A. I'm not sure if he asked about the money then or not.
 "Q. Well, if the tape says — you wouldn't dispute the tape if the tape said that Mr. McConathy asked what about the money and that that issue was never discussed other than, I think, Lieutenant Rigney said one time that's not an issue. So even if he had asked about the money y'all wasn't going to discuss it any further, were you not? You had all intentions at the time to seize that money; is that correct?
"A. If that's what it said. I don't know.
 "Q. But you had all intentions at the time you arrested him and took him back to police headquarters of taking the $8,000, did you not?
 "A. Based on what he told us under Miranda, the conversation that he had and the statements he made to us that money was evidence. We do not give evidence back to defendants. *Page 685 
 "Q. Okay. Did you tell him at the time it was going to be forfeited that he had no right to it?
 "A. I don't recall. I don't know exactly what my words were.
 "Q. At any time during the conversation you made a decision to seize the money?
"A. Yes. It was evidence. I mean —
 "Q. I'm sorry. I need to rephrase myself. Sometime during that conversation you decided that y'all were going to have the money forfeited; is that correct?
"A. Yes.
"Q. And what did you base your decision on?
 "A. Statements that he made in reference to the continuation of his purchasing pills, where that money was coming from, what money he would use to purchase the pills.
 "Q. So, if I told you today I had $8,000 in my pocket and a month down the road I plan on buying $8,000 worth of drugs in your opinion that gives you the right to take my money?
"A. No, because you didn't just do it.
 "MR. HENDERSON: Okay. That's all. No further questions.
"THE COURT: Redirect?
"REDIRECT EXAMINATION
"BY MS. HIEBERT [prosecutor]:
 "Q. When you said in your report that you took the money, the U.S. Currency, off the physical possession of the defendant, do you consider a person who is driving a van to be in physical control of whatever is in that van?
"A. Yes, ma'am. Especially when it's within reach.
 "Q. And what is your understanding of your rights under [§] 20-2-93[, Ala. Code 1975], the forfeiture statute — and if you need to read or you need a copy of it, here it is. In terms of what behavior of a defendant would justify you taking, let's say, $8,000 or a van or whatever?
 "A. If it's believed that that money or that property will be used to further aid a controlled substance crime whether it be used to facilitate the crime, buy drugs, whatever, then it is forfeitable.
"Q. Does that just include sales?
"A. No.
 "Q. Would it include money that you knew was intended to be used to facilitate the controlled substance violation?
"A. Yes, ma'am.
 "Q. Okay. What comments that you are referring to exactly did the defendant make that lead you to believe that the $8,000 in cash he had was going to be used or was intended to be used to violate the controlled substance laws of the state?
 "A. I asked him one time if he intended to keep buying pills, something to that effect, and he stated yes.
 "Q. And, in fact, on the night of the — or the afternoon that this buy took place the defendant actually wanted more pills than you could provide; is that true?
"A. Correct.
 "Q. And how many pills, again, had he wanted on that one particular buy?
"A. He wanted 60.
"Q. And you were only able to come up with how many?
"A. Twenty-three."
In Holloway, supra, a Daphne police officer stopped Holloway for operating a vehicle without a tag. Holloway's explanation for the absence of a tag on the vehicle was that he had purchased the vehicle earlier that day. When Holloway and two passengers got out of the vehicle the officer noticed a large bundle of cash near the driver's seat. The officer obtained Holloway's consent to search the vehicle. The *Page 686 
search revealed $11,680 in United States currency and "quite a bit of marijuana stems and seeds on the floorboard."772 So.2d at 476. The stems and seeds were not seized as evidence. Although Holloway and his passengers were never charged with possession of marijuana, the police seized the money and the vehicle. The State returned the vehicle but filed a petition for forfeiture of the currency because "[b]ased upon investigation by law enforcement officials it [was] believed that the money seized from Freddy L. Holloway on or about February 10, [1999] [was] drug proceeds or was being used to violate [the] Alabama [Controlled] Substances statutes." 772 So.2d at 476. The trial court granted the petition.
On appeal, the Court of Civil Appeals reversed the trial court's judgment, holding that the trial court's finding that the currency "`was used, or intended for use, in a transaction which would be a violation of the Alabama [Controlled] Substances Act' [was] contrary to the great weight of the evidence" where the authorities were unable to trace the $11,680 in United States currency to "`any specific drug transaction or any transaction [in] violation of the Alabama controlled substances law.'"772 So.2d at 477. Similarly, in this case, the State is unable to trace the $8,000 currency to any particular drug transaction, past or future.
In a more recent forfeiture case, Gatlin v. State,846 So.2d 1090 (Ala.Civ.App. 2002), the Court of Civil Appeals stated:
 "The mere proximity of the drugs to the cash in Gatlin's vehicle did not satisfy the State's burden of proof. See Thompson v. State, [715 So.2d 224
(Ala.Civ.App. 1997)]. Our forfeiture cases have found the following circumstances to be indicative of contemplated or completed drug transactions: a large quantity of drugs, see, e.g., Shepherd v. State, 664 So.2d 238 (Ala.Civ.App. 1995) (21 pounds of marihuana); drugs packaged for sale, see, e.g., Pointer v. State, 668 So.2d 41 (Ala.Civ.App. 1995); drug paraphernalia or accouterments indicating sale, such as `baggies' or scales, see, e.g., Johnson v. State, 667 So.2d 105, 108 (Ala.Civ.App. 1995). None of those circumstances, nor an equivalent circumstance, is present in this case.
 "Our forfeiture cases have also remarked on the inherent incredibility of a defendant's explanation for having in his or her possession a large quantity of cash. See, e.g., Harris v. State, 821 So.2d 177
(Ala. 2001) (finding inherently incredible a defendant's story that the source of $120,000 in cash was a $90,000 payment the defendant received upon her husband's death 17 years earlier, an amount that the defendant said had increased to $120,000 despite the fact that the defendant admitted that she kept the money at home in shoe boxes and lent some to friends, but charged no interest). See also Vaughn v. State, 655 So.2d 1039, 1041 (Ala.Civ.App. 1995) (noting that the defendant, who was found with a large amount of cash, was unemployed and had `no visible means of support'). In the present case, Gatlin was gainfully employed and presented plausible explanations for the presence of the cash in his vehicle."
846 So.2d at 1092-93. The facts in Gatlin were as follows:
 "In the early morning hours of July 4, 2001, Officer David Hicks of the Trinity Police Department stopped a Chevrolet truck for speeding. Gatlin was driving the truck. Hicks noticed the smell of alcohol on Gatlin's breath and asked him to perform three field-sobriety tests. When Gatlin failed all three tests, Officer Hicks arrested him for driving under *Page 687 
the influence of alcohol. He was not charged with the use of any illegal drug.
 "Officer Hicks and two other officers then searched Gatlin's vehicle. Among other things, they found an open beer can in the truck. On top of the console between the seats the officers found a blue prescription bottle containing eight pills later determined to contain the controlled substance dihydrocodeinone. The prescription label on the bottle had been partially torn and there was no patient name, but the word `Lorcet' was visible. When the officers asked Gatlin about the pills, he said they were painkillers, but they were not his, and he did not know how they came to be in his truck. Inside the console, the officers found $4,100 in $100 bills. Except for two loose bills, the money was packaged in two bank wrappers marked `Heritage Bank' and stamped `April 9, 2001.' Under the money was a small cellophane bag containing a green leafy substance later determined to be .03 ounces, or 1 gram, of marijuana. Gatlin denied that the marijuana was his. Also inside the console was one loose yellow pill later determined to contain the controlled substance oxycodone. Gatlin disclaimed any knowledge of the yellow pill. Gatlin told the officers the money came from his having cashed two or three paychecks. Trinity Police Chief Chris McLemore testified that the day after Gatlin was arrested and the currency was seized, Gatlin's mother telephoned him and said that the money was hers. On cross-examination by Gatlin's lawyer, Officer Hicks stated that Gatlin had a reputation as a drug dealer.
 "At trial, Gatlin denied that he was a drug dealer or a drug user. He said that he had never been arrested by officers of the Trinity Police Department. He testified that he had been employed for four years at BE K Construction Company; that he made $22 per hour; that he worked 40 hours per week plus overtime; and that he had had earnings in excess of $50,000 each year for the past two years. He introduced, and the trial court admitted into evidence, two income tax returns showing a gross income of $57,874 for the year 2000 and $52,647 for the year 1999. Gatlin stated that as a condition of his employment, he was required to take random drug tests. He introduced, and the trial court admitted into evidence, documents indicating that he had passed a number of drug tests administered by his employer, as well as an independent test to which he had submitted 20 days after his arrest.
 "Gatlin testified that at the time of his arrest he was separated from his wife, was living in a local motel, and was saving money to buy a camper in which to live. He said that he was going through a divorce; that he usually cashed his paychecks and did not deposit them into a checking account. He stated that he had cashed three recent paychecks totaling about $3,800, and had recently sold a pick-up truck for $5,800 in cash to his friend Paul Rollin. Rollin testified that he paid Gatlin for the truck in $100 bills, which he obtained from Heritage Bank. The record contains a bill of sale for the truck, dated April 10, 2001.
 "Gatlin said that after his arrest he learned that the pills in the blue prescription bottle belonged to his brother-in-law, who often borrowed his truck, and who had been prescribed painkillers after recent back surgery. Gatlin offered, and the trial court admitted into evidence, a prescription issued in the name of Gatlin's brother-in-law for the same pills found in Gatlin's truck."
846 So.2d at 1092-93.
McConathy presented undisputed evidence as to the source of the seized currency, *Page 688 
and the officers were unable to trace the currency to "`any specific drug transaction or any transaction [in] violation of the Alabama controlled substances law.'" Holloway,772 So.2d at 477.
The fact that McConathy had $8,000 on December 18, 2002, and according to Officer Boyd he led the officers to believe that he was going to continue to purchase controlled substances is insufficient to establish a prima facie case under § 20-2-93, Ala. Code 1975. As the court noted in Gatlin, supra, "[a]lthough the evidence presented by the State might lead one to suspect
that Gatlin was involved in illegal drug activity, mere suspicion is insufficient to support a judgment of forfeiture."846 So.2d at 1093. As was the case in Gatlin, there is no concrete evidence tying the $8,000 to a specific drug transaction, past or future. To say that McConathy would use this $8,000 to purchase controlled substances at a future date is simply speculation, and speculation will not support a judgment of forfeiture.
Because, after reviewing the record in this case, we conclude that the judgment in this case is against the great weight of the evidence, the judgment of the Court of Civil Appeals is reversed and the case remanded for that court to reverse the trial court's judgment of forfeiture and remand the cause to the circuit court for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, LYONS, HARWOOD, WOODALL, BOLIN, and PARKER, JJ., concur.
[1] The petitioner's name is spelled McConathey in the court reporter's transcript.
[2] McConathy styled this motion as a "motion for directed verdict." However, effective October 1, 1995, Rule 50, Ala. R. Civ. P., was amended to rename a motion for a directed verdict as a motion for a judgment as a matter of law.
[3] At the agreed-upon price, 23 Xanax pills should have cost $69; however, the officers received only $67.00 from the informant after the buy.
[4] Although no one, including McConathy, disputes that McConathy purchased 23 Xanax pills, only 22 Xanax pills were in the bottle seized from McConathy.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).